Jay T. Jambeck (SBN 226018)
Mandy G. Leigh (SBN 225748)
LEIGH LAW GROUP, P.C.
870 Market Street, Suite 1157
San Francisco, CA 94102
Telephone:    415-399-9155
Facsimile:    415-795-3733

*Attorneys for Plaintiffs*
LEAH MARKS on behalf of
S.M. and LEAH MARKS

## IN THE UNITED STATES DISTRICT FOR
## THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEAH MARKS on behalf of S.M, and LEAH MARKS, individually,<br><br>Plaintiffs,<br><br>v.<br><br>SANTA ROSA CITY SCHOOLS and AMBER FOX, individually,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d (DISPARATE TREATMENT);<br>2. VIOLATION OF 42 U.S.C. SECTION 1983 (EQUAL PROTECTION);<br>3. RETALIATION IN VIOLATION OF TITLE VI, 42 U.S.C. § 2000d<br><br>JURY TRIAL DEMANDED |

Plaintiffs allege as follows:

1

## THE PARTIES

1. Plaintiff, minor child S.M. by and through her parent/guardian LEAH MARKS is bi-racial of African-American and Caucasian descent (sometimes collectively referred to as the "minor Plaintiff."). Plaintiff, LEAH MARKS and S.M. reside in Sonoma County, California.

2. Defendant SANTA ROSA CITY SCHOOLS ("SRCS") pursuant to relevant state and federal laws and with receipt of Federal funds, provides educational services to school-aged children.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter for the claims in this complaint pursuant to 28 U.S.C. §1331. This action arises under the laws of the United States, Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d as well as 42 U.S.C. § 1983. Plaintiff has exhausted all requisite administrative remedies.

4. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because the Northern District of California is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and in which the parties to this litigation reside.

## GENERAL ALLEGATIONS

5. The minor Plaintiff attends and at all relevant times attended a school within the jurisdictional boundaries of SRCS. S.M. transferred to SRCS in March of 2012 from Hidden Valley Elementary School; both schools are in the SRCS District. In the fall of 2012, S.M. started first grade at the Santa Rosa Charter School for the Arts (SRCS) and looked forward to the year as a time of making new friends and learning new ideas.

6. However, S.M. began to learn that at least some students were not allowed to play with her. S.M. reported to her mother LEAH MARKS throughout the fall of 2012 that "A's [student's name withheld on basis of privacy of a minor] mom won't let her play with me." Thinking that A's mother was simply another parent at the school, LEAH MARKS told her daughter to respect the wishes of A's mother.

7.  In the spring of 2013, still the first grade year, LEAH MARKS discovered that A's mother was named AMBER FOX who was an employee of SRCS in the dual position of yard duty at the school during school hours and in the position of assistant supervisor for the after school program in which S.M. participated.

8.  Not believing that S.M. had understood what was being conveyed to her by A, LEAH MARKS questioned S.M. daily on the events that had transpired during the day in search of any events that might have caused the restrictions. It became clear that nothing out of the ordinary had happened to warrant S.M.'s restriction from playing with A.F, so LEAH MARKS contacted the school's principal, Elizabeth Evans, and the supervisor of the after school program, Erik Klouse, to discuss the matter further. Neither were aware of such a restriction, but said they would look into it. A few more weeks passed, and S.M. continued to come home with the same story every day, "Miss Amber said I couldn't play with A.F. today and told me to go play somewhere else."

9.  Thereafter, LEAH MARKS met with the principal and after school program supervisor on several other occasions to discuss the information S.M. was telling her on a daily basis. At one meeting it was stated that administration had been informed of an incident where three girls, S.M., A.F., and H.S. had been found coloring on a bench on campus and all three girls had been restricted from playing together. LEAH MARKS asked when this had happened, and no one was able to provide any other details regarding the matter. LEAH MARKS asked why a singular event would warrant an ongoing restriction such as this and why no effort was made for the girls to reconcile their mistake.

10. On the last day of school, S.M. was slapped in the face by C., another student at SRCS. It was discovered that A. had told C. to slap S.M. in the face but denied doing so. LEAH MARKS asked an after care staff member, Wanda Martinez, to get the three children together to discuss the problem and work it out. During the discussion, AMBER FOX walked over to see what was going on and, as soon as C. stated that A. had told him to slap S.M., Amber Fox began

1   screaming, "SEE, THIS IS EXACTLY WHY I DON'T WANT THEM PLAYING TOGETHER."
2   LEAH MARKS and S.M. and immediately left.

3   11.   It was from this incident that LEAH MARKS realized that in fact AMBER FOX
4   had told S.M. not to play with her daughter.

5   12.   In the Fall of 2013, S.M. again attended SRCS for her second grade year.  During
6   the first few weeks of classes, LEAH MARKS would ask S.M. whether she was being restricted
7   from playing with anyone.  S.M. reported nearly every day she was given some restriction by
8   AMBER FOX that would have the effect of keeping S.M. from playing with Ms. FOX's daughter.

9   13.   In class, when Ms. FOX is not present, S.M. and A.F. frequently had positive
10  interactions and were, in fact, best friends.  However, during aftercare and recess, in the Fall of
11  2013 and continuing thereafter, when Ms. FOX was involved, S.M. and A.F. were not allowed to
12  play with each other.  LEAH MARKS had decided to speak to AMBER FOX'S supervisor first
13  about the events from the last day of first grade and about what S.M. had been saying all along,
14  because AMBER FOX had chosen to use her authority to apply restrictions against S.M. rather
15  than applying them to her own daughter.

16  14.   LEAH MARKS attempted to talk with Erik Klouse, AMBER FOX'S supervisor,
17  for the first several weeks of school, but her attempts were thwarted by differences in their work
18  schedules.  LEAH MARKS left work early on a Friday about five or six weeks into the school
19  year in order to talk with Erik Klouse.  Privately they discussed AMBER FOX'S outburst on the
20  last day of school, and LEAH MARKS made clear her concerns about AMBER FOX and
21  expressed how irrational, erratic, and unprofessional her behavior was.  Mr. Klouse ensured he
22  would address the matter.

23  15.   The following Monday morning, LEAH MARKS arrived at school with S.M. and
24  walked her into the cafeteria to get settled in.  It became clear that Erik Klouse had already spoken
25  with AMBER FOX, because she approached LEAH MARKS aggressively and stated, "I think we
26  should talk!"  LEAH MARKS gladly agreed, and AMBER FOX said, "or maybe we should have
27  Erik mediate the conversation."  LEAH MARKS said, "Whatever you prefer, Amber, I'd love to
28

4

sit down and talk about everything… Can you meet on Friday, because I can get off work early that day?" AMBER FOX agreed to meet that Friday to further the discussion.

16. When Ms. MARKS attempted to meet on the pre-arranged date, Ms. MARKS called Ms. FOX on the way to their meeting, and Ms. FOX stated at first that she was not able to meet for reasons that appeared to be specious. Ms. MARKS persisted because she wanted to address the issue of the restrictions being placed upon S.M.

17. Ms. FOX reluctantly agreed and Ms. MARKS inquired as to the reason why S.M. was being restricted from playing with certain children. Ms. FOX provided differing rationales one of which is that another parent had requested that S.M. and A.F. not play with her child. This was in fact false as Ms. MARKS discovered after speaking with the parent later that same day and in person on several other occasions.

18. Ms. MARKS pointed out that Ms. FOX appeared to be restricting S.M. from playing with A.F. at which point Ms. FOX became upset and defensive and in effect ended the conversation.

19. After the meeting, Ms. MARKS immediately called Ms. FOX's supervisor, Erik Klouse, to report the incident but was only able to leave a message. Mr. Klouse returned Ms. MARKS' call within minutes, at which time Ms. MARKS retold the details of the events prior. She made it clear to Mr. Klouse how unprofessional and disconcerting Ms. FOX'S reaction was to such a simple question. She told him of the claims she made that another parent had requested the three girls be restricted from playing together, but she was unable to provide any proof of this or even one good reason as to why. Upon discussing the matter with Ms. FOX's supervisor that following Monday, Ms. MARKS was informed that Ms. FOX had advised, falsely, that she had been "cornered" during the conversation even though she requested the meeting.

20. This circumstance began a pattern by Ms. FOX of discriminating against S.M. and taking retaliatory actions against LEAH MARKS – in fact using falsehoods in an attempt to portray Ms. MARKS as a problem. On one occasion, Ms. MARKS attempted to reach S.M. via telephone to advise her of a change in afternoon plans. On that day (April 4, 2014), AMBER FOX

answered the call, said she could not take the time to advise S.M. of the call but could take a message to which Ms. MARKS stated it was not necessary.  This might have been the end of it.

21. Instead, Ms. MARKS received a call from Principal Evans explaining that Ms. FOX had complained to her that, in the above referenced call, Ms. MARKS had stated: *"[profanity] no, you [profanity] [profanity], you can go[profanity] [profanity] yourself!"* and hung up the phone.  This report by Ms. FOX was false and was intended to retaliate against Ms. MARKS for complaining about Ms. FOX's treatment of S.M.  At the time of the call with Ms. FOX, Ms. MARKS was seated at her desk at work with her supervisor immediately adjacent – well within earshot.  Ms. MARKS advised Principal Evans to speak with her supervisor, Principal Evans agreed, and Ms. MARKS immediately handed the telephone to her supervisor who had a short conversation and confirmed to principal Evans during no profanity had issued from Ms. MARKS.

22. This again might have been the end of it.  However, Principal Evans' response was that the matter was hearsay and that no determination could be made that Ms. FOX was lying even though Principal Evans had spoken with a third party who had no opportunity to even be advised about what had occurred by Ms. MARKS prior to confirming that no profanity had issued.

23. MS. FOX was ultimately found to have made false accusations against MS. MARKS, which is documented in the Closing Report drafted by the private investigator hired by SRCSD to investigate the complaint submitted by LEAH MARKS.

24. The investigator's findings stated that disciplinary action was given to Ms. MARKS' FOX for her behavior; however, shortly into the new school year, Ms. FOX was promoted to the Supervising Yard Duty position because all the other employees had left their jobs, requested transfers, or resigned from their positions at SRCS.

25. On another occasion, F.B., a student in Ms. Hopkin's class, was two hours late to school that Friday morning.  After arriving at school, Ms. Fox approached Ms. Hopkin and said she knew why F.B. was late, and that F.B.'s mom had told her why.  MS. FOX

6

1 then informed MS. Hopkin that F.B.'s mom told her directly that F.B. was late because she was
2 scared too come to school, which was because S.M. was bullying her.
3      26.     Ms. Hopkin told Ms. Fox to direct all parents to her in the future should they
4 need to discuss things such as reasons for being late and without question in the case of possible
5 bullying.
6      27.     Ms. Hopkin questioned the story Ms. Fox told, because it didn't reflect the type
7 of relationship she witnessed between S.M. and F.B. nearly every day for the past year.  She then
8 called F.B.'S mother.
9      28.     Ms. Hopkin told F.B.'s mother what was said by Ms. Fox.  F.B.'s mother told
10 MS. Hopkin that she had not said anything like that to MS. FOX, and that she didn't even know
11 who S.M. was.
12      29.     MS. Hopkin talked to S.M. and F.B. about their relationship and the claims made
13 by MS. FOX.  It was confirmed that the two girls shared a healthy, peaceful, normal friendship, so
14 Ms. Hopkin decided to make a formal complaint about MS. FOX and her misconduct towards
15 S.M. and her family.  MS. Hopkin filed the complaint in person directly to PRINCIPAL EVANS
16 that afternoon and asked that MS. FOX be relieved of her duties at the school immediately,
17 sighting her erratic and malicious behavior pattern as justification for her dismissal.  She also
18 asked PRINCIPAL EVANS to call LEAH MARKS and inform her of what MS. FOX had said
19 and done to S.M. that day.
20      30.     MS. Hopkin returned to MS. EVANS' office later in the day to confirm she had
21 called LEAH MARKS, but she had not done so.  MS. Hopkin asked MS. EVANS again to call
22 LEAH MARKS, further stressing the significant concern she had for S.M.'s safety and well-being
23 in the aftercare program and the importance of informing S.M.'s mother so she could make an
24 informed decision on the matter.
25      31.     MS. EVANS still had not called LEAH MARKS when MS. Hopkin returned to
26
27
28

1 the Principal's Office an hour or so later.  MS. Hopkin stated the same message once more, and
2 added that she would call LEAH MARKS prior to the end of the school day (before the aftercare
3 program started) if MS. EVANS was still refusing to make the call.

4       32.      Ms. Hopkin checked again, and PRINCIPAL EVANS was still refusing to
5 call MS. MARKS about her daughter.  MS. Hopkin told PRINCIPAL EVANS that she would be
6 calling LEAH MARKS to express her genuine concern for S.M.'s safety and well-being during
7 aftercare while under the authority and protection of AMBER FOX.

8       33.      Ms. Hopkin called LEAH MARKS and stated that she did not feel it was in S.M.'s
9 best interest to attend the afterschool/aftercare program that day.  MS. MARKS had many
10 questions, and Ms. Hopkin told her to speak to PRINCIPAL EVANS for further details.

11       34.      MS. MARKS left work and called PRINCIPAL EVANS immediately.  The office
12 staff answered the call, but MS. MARKS was told the principal was on another call and could not
13 talk just then.  MS. MARKS asked to leave an urgent message.  The message stated that MS.
14 MARKS was on her way to the school after speaking to MS. Hopkin; she said she had no details
15 about what had happened, and she asked MS. EVANS to call her BEFORE leaving the office for
16 the day.  MS. MARKS also asked that S.M. not be sent to the aftercare program that day and to
17 have her sit and wait in the office until she arrived.

18       35.      Upon arriving at the school, MS. MARKS located S.M., who was with MS. Hopkin
19 to ensure her safety and well-being.  MS. MARKS entered the Office and found that MS. EVANS
20 had left for the day/weekend and could not be reached until Monday.  MS. MARKS scheduled the
21 earliest possible meeting with MS. EVANS for that coming Tuesday, April 22, 2014.

22       36.      LEAH MARKS and Pamela Marks (LEAH MARKS' mother) met PRINCIPAL
23 EVANS at 8:00 am on Tuesday April 22, 2014.  PRINCIPAL EVANS refused to tell them what
24 MS. FOX had done or said or what had happened the previous Friday.  LEAH MARKS reminded
25 the principal of all the times she had met with her to express her concerns about MS. FOX and her
26 behavior towards S.M., and she asked why MS. EVANS felt it unnecessary to inform her of the

27
28

events that happened on Friday surrounding S.M. and AMBER FOX and why it was necessary for her to continue to withhold information about that day after the fact.

37. PRINCIPAL EVANS claimed there was not enough evidence to separate the truth from the lies and felt she could not tell MS. MARKS what had happened as a result. MS. MARKS requested an investigation into the matter and that a meeting be held with the all the people involved in order to resolve the "he said/she said" game.

38. PRINCIPAL EVANS proceeded to inform MS. MARKS of previous investigations that had been done on allegations made by MS. FOX against MS. MARKS and S.M. This was the first time either LEAH or Pamela Marks had been told that MS. FOX had made complaints to the principal regarding our family. MS. MARKS asked why she was never informed of this until now, presumably as a conversational mishap, and especially since MS. MARKS had given so many complaints to MS. EVANS about MS. FOX during the two years' prior, none of which were kept secret from MS. FOX.

39. PRINCIPAL EVANS failed to investigate any of the complaints detailed by MS. MARKS. No merit was given to the direct and explicit concerns and requests for her termination from Ms. Hopkin and others, all of which were made directly to PRINCIPAL EVANS, including MS. Hopkin's concern for the safety and wellbeing of S.M.

40. Mr. Reynolds' findings stated that disciplinary action was given to Ms. FOX for her behavior; however, shortly into the new year, Ms. FOX was promoted to the Supervising Yard Duty position because all the other employees had left their jobs, requested transfers, or resigned from their positions at SRCS.

41. Plaintiffs voluntarily exhausted administrative remedies by submitting a uniform complaint to the District.

**FIRST CAUSE OF ACTION**
VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d
(DISPARATE TREATMENT)
(minor plaintiff against District)

42. Plaintiffs incorporate the paragraphs alleged above as though fully set forth in this

paragraph.

43. The Civil Rights Act of 1964 prevents discrimination on the basis of race and national origin.

44. The minor Plaintiff is of mixed African/American race.

45. SRCS received federal funds for its entire educational program.

46. SRCS violated 42 U.S.C. § 2000d by intentionally discriminating against Plaintiffs as a result of their race/national origin by its deliberate indifference to the discrimination and harassment against the minor Plaintiff. SRCS had knowledge of and allowed for a pervasive, severe and objectively hostile environment regarding race to continue by failing to adequately address the discrimination and harassment against the minor Plaintiff.

47. As a direct and proximate result of the disparate treatment, Plaintiffs suffered special and general damages, including stigmatization, loss of social companions and typical social opportunities, scorn, embarrassment, humiliation and lost education opportunities.

## SECOND CAUSE OF ACTION

## VIOLATION OF 42 U.S.C. § 1983 FOR DEPRIVATION

## OF THE RIGHT TO EQUAL PROTECTION

(minor Plaintiff against Amber Fox)

48. Plaintiffs incorporate the paragraphs alleged above as though fully set forth in this paragraph.

49. The minor Plaintiff is of mixed African/American race.

50. FOX, acting under color of law as an employee of SRCS, deprived the minor Plaintiff of equal protection under the laws in violation of 42 U.S.C. § 1983 by discriminating against the minor Plaintiff based upon her race. FOX refused to let her daughter socialize with the minor Plaintiff and made fabricated accusations against S.M.

51. FOX acted intentionally or with deliberate indifference by treating the minor plaintiff differently because of her race.

52. As a direct and proximate result of the disparate treatment, Plaintiffs suffered special and general damages, including stigmatization, loss of social companions and typical social opportunities, scorn, embarrassment, humiliation and lost education opportunities

### THIRD CAUSE OF ACTION

### VIOLATIONS OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

42 U.S.C. §2000d

(Retaliation – LEAH MARKS. against District)

53. Plaintiffs incorporate the paragraphs alleged above as though fully set forth in this paragraph.

54. SRCS receives federal funds for its entire program.

55. Federal regulations promulgated by the United States Department of Education provide:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e).

56. District employees intentionally intimidated, coerced and discriminated against Plaintiff LEAH MARKS for the purpose of interfering with their right to advocate on behalf of her children by issuing baseless orders restricting or barring LEAH MARKS from campus, failing to fully and adequately investigate complaints and otherwise in wrongfully portraying LEAH MARKS as a troublemaker simply because she was advocating for her child.

57. As a direct and proximate result of the actions of the District employees, Plaintiff S.F. suffered general damages in an amount to be set forth at trial.

## JURY TRIAL DEMAND

58. Plaintiff demands a jury trial on all issues for which Plaintiff is entitled as a matter of right.

## PRAYER

Plaintiff prays that the Court award damages and provide relief as follows:

1. General and special damages according to proof at trial;
2. Other remedies that this Court deems equitable and appropriate;
3. A permanent injunction prohibiting Defendant from retaliating against Plaintiffs;
4. A permanent injunction requiring Defendant to take reasonable measures to prevent Plaintiffs from being subjected to harassment;
5. Reasonable Attorneys' fees and costs pursuant to statute;
6. Punitive damages against AMBER FOX;
7. Any remedies that this Court deems equitable and appropriate.

Dated this 15th day of August 2016            Respectfully submitted,

                                                         /s/ Jay T. Jambeck
                                       By:_____
                                             Jay T. Jambeck
                                             *Attorneys for Plaintiffs*